May it please the court, I'm Jim Calamon, arguing on behalf of the Grant County Public Utility District. I would like to reserve one minute of my seven and a half minutes of time, and the other seven and a half will be used by Mr. Tierney, who's going to argue on behalf of the court. May it please the court, the most important single fact in this appeal issue is that 11 months into the litigation, CBI completely flipped its position and went from being a defendant to bringing claims against the port and the public utility district. Prior to that, there was no dispute between the signatories to the 1979 lease. Therefore, there was no right to arbitrate. The CBI went from saying that the lease went to the plaintiff. Why couldn't you insist on arbitration against the plaintiffs? I don't understand. The plaintiffs were not signatories to the lease. They had a claim, a third-party beneficiary claim. But the plaintiffs cannot have a claim greater than that which their sublessor had. Their sublessor was CBI. It said the lease expired in 2012. The plaintiffs cannot force CBI to request an extension to a lease that it does not want. Therefore, the party through whom they claimed that they had a right did not take a position that supported that. Therefore, there was no dispute that we could force on the plaintiffs. You didn't think there was any case law that would support a contention that they had to submit to arbitration? That's right, Your Honor. In the cases cited by the plaintiffs, they indicate that there is case law where third parties can be brought in. But in every one of those cases, the signatories Well, it was just more than a third-party situation. They alleged in their complaint that they were third-party beneficiaries. Yes, they did. Pretty clearly. Yes, they did. But there was no case that the plaintiffs have cited where the third-party beneficiaries could be required to come into arbitration where there was not already a dispute between the signatories to the lease. And here there was none. There was none until CBI changed its position. It changed its position dramatically. Let me ask you a question. What do you think would have been the plaintiff's response if you would have tried to bring him into arbitration initially? I think their response would be absolutely no way. You have no right to bring us into arbitration. We chose this forum, and we want to do it in federal court. And would they have authority to support their position? I think they would have until What about the successors in the science clause in the lease agreement? The successors in the science clause says that they may have a right through a party to the lease. Well, the party to the lease was CBI. And CBI's position was that the lease expired in 2012, that there was no breach of the lease, and that the parties had no right. And so they can't have a claim. But that was just their position, right? Yes. And that was what they were arguing. Well, that's right. And we have to take that, and we have to make our decisions in response to that. Well, not necessarily so. You could have presented it to the district court judge, and he could have decided. Well, I submit that prior to CBI flipping and becoming a plaintiff rather than defendant, that there was no dispute between the signatories to the lease. And since there's no dispute between the signatories, then a third-party beneficiary alleging a claim through one of those signatories cannot have a claim greater than one of those signatories. And here also, there was no prejudice to the plaintiffs involved in this case. All of the activities that occurred in the district court would have occurred in arbitration. There was discovery that went on. There would be discovery in arbitration. Would it be the same extent? Yes. Because the same kind of discovery that takes place in district court can also be obtained in an arbitration proceeding? Yes, it can. Yes, it can. It's up to the panel. Do the federal rules apply? I think that it's up to the arbitration panels to do that, but they would all be able to. But it's not a matter of right, as it is in federal court. I think that all the parties would be requesting that the federal rules apply. Well, how do you know that all the parties would be requesting that the federal rules of discovery would apply in an arbitration proceeding? Well, I know that the PUD would request that. And the entitlement to arbitration is not tied to whether or not the federal rules do or not apply. It is grounded upon the agreement that gives rise to the arbitration obligation. And here, that agreement is very clear that when there's a dispute, we're entitled to it. Here ---- There was more than just discovery that took place here, wasn't there? There's discovery and there's some depositions that have taken place. And all of that would have occurred in front of an arbitrator. And the judge handed down a few rulings, correct? He entered an injunction, correct? That's right. All of this would have happened or could have happened in front of an arbitrator as well. And he expressed some pretty strong views, correct? He did express some pretty strong views and also expressed both for and against. I would say that the court and the district sort of were a little trying to, you know, to sidestep the judge and then decided to ask for arbitration. No. Well, one could say that, Your Honor, but also one could say that we are taking advantage of and accessing a right to arbitrate that clearly is set forth in 1979 lease. And, again, there's the fact that there's 400 members here, 400 plaintiffs, and the plaintiffs are contending that they feel that this is going to be excessive, expensive. I mean, there's 400 individuals who are making claims against PUD and the court. I mean, if each one paid $1,000, that's not onerous to them. Let me ask you this. The plaintiff's position that the leases expire in 2023, is that correct? Yes, Your Honor. What's the basis for that position? Their basis for that, I understand, is there's a section in the 1979 lease that says the party's desire to extend it to 2023 should the matter be approved, should that be approved by FERC. And there was a lot of interaction between CBI and the PUD from the time that lease, especially in the 80s and 90s, where CBI had requested and wanted to do more development. We understood that from the PUD. We said we need to have more information. It needs to be approved by stakeholders. And CBI never did that. We said, look, we'll send it in the way it is if you want. And they never asked us to. Well, see, I guess it would seem that it was always in CBI's interest to have a longer-term lease. So it's hard for me. I'm having a little trouble understanding how this dispute all of a sudden, the disagreement all of a sudden arose after plaintiffs took over. Right, Your Honor. But in that regard, CBI made it aware, the PUD aware, that it wanted to have a longer lease. We said this is what you need to do. The 1962 and 1979 lease require that you get your request for a development plan approved by the PUD and the Port. And they submitted development plans. They were deficient. We told them why. And we said this is what you need to do. We'll send it to FERC for an extension if you want us to. They never asked us to do that. Because we had to have an enhanced public interest by increased recreation and public recreation and access. They never did that. And so then prior to the lease expiring, CBI indicated that they were no longer interested in the lease going beyond 2012. And, in fact, their answer says that very same thing. So thank you, Your Honor. I'm going to reserve a little bit of time here. Thank you. Good morning, Your Honors. Michael Tierney representing the Court of Quincy. I see that I have seven minutes left. I'd like to reserve why don't I try to use five minutes and we'll split our rebuttal time. If I could address the point you raised, Judge Schrader, it's important first as a background point to recognize that there's really two kinds of issues being presented by the plaintiffs in this case. One is that the existing lease should have been extended to 2023. There's another, and the court is very much involved in that piece of the case, there's another part of this case which is that when it was clear that that lease wasn't going to be extended, the residents at one end and the PUD at the other end engaged in direct discussions regarding a new arrangement that might go to 2053 or 2052. That is the bigger piece of this case. They skipped CBI and they skipped the port in those discussions. They were directly between the residents and the PUD. The port had no interest in going forward. CBI had no interest in going forward. You asked why did CBI have no interest in going forward. It was a developer. It started out with grandiose plans to develop this island, and it ran afoul of opposition from the Department of Fish and Wildlife. Once that became clear and once they tried several maneuvers to get around that, they were no longer interested. They tried finally to get the island removed from project boundaries so that FERC approval was no longer necessary, but that didn't work. The port, and this is my point and why I want to stand up and argue separately, is that the port is in a unique and different position from the PUD here. The port has no control over any of this. It has no control over CBI. It certainly has no control over the PUD. Its lease expired in 2012. It was a 50-year lease starting in 1962. So it had no power, no means to give the plaintiffs what they wanted. If CBI didn't want to renew the lease, the port couldn't hold a gun to CBI's head and say renew this lease, nor could it do that to the Fish and Wildlife, nor could it do that to the PUD, and it certainly has no relationship of any kind with FERC. So at the outset of this litigation, the port is secure in knowing that how could we ever renew this lease? We don't have anything to do with this 2053 issue. We're only in here on this extended to 2023. But we've got nothing to do with that. We have no ability to do it. And here is CBI where we know they don't want to go forward, and their pleadings say no, the port did not breach this lease. The PUD did not breach this lease. The plaintiffs have no right to try to enforce this lease. So at the outset... How are you hurt by the district court's order then? Well, we have a contractual right under the lease that we signed to arbitrate a dispute with CBI if CBI accuses us of breaching the lease. That's our contractual right. So you're also contending that you have a contractual right to force the individual plaintiffs to come into arbitration. It's an important distinction, and I want to emphasize that we did not ask for arbitration with the plaintiffs. Okay. We only asked for arbitration with CBI. So then let me ask you another question. Do you see a problem with perhaps arbitration going forward with CBI and arbitration going forward with the individual plaintiffs and possibly having inconsistent or adverse judgments, if you will? The practice, and I'm drawing a blank all of a sudden on this citation, but the practice when there are arbitrable claims and non-arbitrable claims is for the courts to stay the non-arbitrable claims, allow arbitration to proceed its course, and then survey the situation as it exists. But that's if you have the same party that's being subjected in some claims to arbitrable claims and others that are non-arbitrable claims. But here you're talking about two different parties. Well, first, I would dispute whether there's really two different parties or multiple parties on the plaintiff's side. I mean, there's four sets of lawyers. They talk about wanting to cut their expenses, but there's still four law firms representing what's in essence a monolithic group. It's a bunch of residents on Crescent Bar Island. They own the management company that runs it, which is CBI. I really don't see any distinction among them. I mean, all I know is that they say they settled their claims against CBI, and that was the bulwark that we had, the firewall, if you will, that the port was secure knowing that. It was certainly not guilty of any breach because here is CBI, the party that supposedly breached its relationship with saying, no, we didn't want to go forward, and no, the port hasn't breached anything. And now they've turned around and they've pointed their guns at us, and they're saying, well, we've changed our mind. Somebody has bought our shares of stocks, so we've decided to go back and rewrite history and say that you over there, the port, you have breached this agreement with us. Now, we have a contractual right to arbitrate that issue, and it's protected by the Federal Arbitration Act. But getting back to the issue, where does the contractual right to arbitrate with the individual plaintiffs come from? I'm not asserting an arbitrary right to arbitrate with the individual plaintiffs. Not you. That's why I'm standing up here separately. I think the plaintiffs would be wise to participate, and I think as a matter of practicality, the plaintiffs are pulling the strings for CBI. I mean, if there's an arbitration with CBI, it's going to be an arbitration with the plaintiffs, and there certainly will be collateral estoppel effects that flow from the arbitration, and there are recognized at law collateral estoppel effects from arbitration, and I think that will take place. Your time is up. Sorry. Thank you. Your Honor, may it please the Court, Glenn Amster for all of the plaintiffs with me at council table is Bruce Johnston, counsel for CBI. If you have any questions that I can't answer about their participation. Let me address, first of all, some of the questions you've been posing to appellants' counsel. There has never been, never, in the record or otherwise, any suggestion from CBI that it was not interested in extending the lease to 2023. Never. Never anything to these lessors suggesting that CBI did not want to extend the lease. The Port is the party that evicted the plaintiffs from the island. The Port signed a separate lease with the plaintiffs in 1973, extending the lease to 2023 without any contingencies. And the PUD and the Port and the CBI entered into the 1979 lease, which Judge Krakenbusch has made quite clear his view of their position. In the oral argument on this motion to compel, and as you pointed out, Judge Paez, in other instances, what's your position as to whether the lease should be extended to 2023? Mr. Kalman, it should not be extended. And what's the basis for that? Well, the PUD has the option to decide whether it should be approved. Even though you've agreed under the 79 agreement that it should be extended, well, it says it's the desire to extend to 2023. The Court, don't tell me desire. It was the agreement of the parties. That's what the agreement says. Counsel, who's that agreement between? It's between CBI, the Port, and PUD. And it contains, I might add. Okay, wait, wait, wait, just a second. Certainly. I know you want to get to the issues you want to address. So there's an agreement, according to you, that there's an agreement between the Port, PUD, and CBI, where they talk about extending the lease. And you're saying that that constitutes an actual extension to 2023, right? It puts an obligation on the parties to seek FERC approval for a 2023 extension, an extension which they never sought. And all of the arguments they're telling you now about we asked them for plans, we asked them for the lease, the lease doesn't make any provision for any of that, and the judge rejected those claims. But if they didn't get it, the lease terminated, didn't it? If they didn't get it, the lease would have terminated, and as Judge Quackenbush indicated, then there may have been a damage claim instead of a specific performance claim. But we didn't get to that issue because they have essentially ignored the lease over the last four years until 2010. They had expressly and unequivocally promised the plaintiffs that they would extend the lease, both according to the terms of the written lease, as well as according to promises they made during their relicensing process. So did that lease agreement contain an arbitration clause? The 1979 lease contained a, and we take the position it's not a mandatory arbitration clause, but it does contain an arbitration clause, yes. So you want to enforce the lease, but you don't want to enforce the arbitration clause. Well, the arbitration clause, Your Honor, as Judge Quackenbush held, has been waived under any evaluation. Against the plaintiffs. Excuse me? Against the plaintiffs. Against the plaintiffs, against all the parties. Why against CBI? They weren't adverse to the court and to the district until the plaintiffs took over CBI, CBI essentially withdrew its answer, filed a new answer, withdrawing all its defenses and filed a counter cross-complaint. The issue under the lease was framed by the plaintiff's complaint from day one. Their denial or CBI's denial of plaintiffs' right to assert the issues under the lease was just as arbitrable at that point as our claims against the defendants were arbitrable at that point in time. I thought CBI was essentially on their side in response to the original complaint. At the outset of the litigation, they denied that they were, they denied that they were in breach. Their answer is quite ambiguous, or not ambiguous, it's equivocal with respect to, unequivocal with respect to the. At the outset of the litigation, when all the issues were joined after the complaint was filed and the answers were filed, CBI was essentially in the same position, on the same side as the court and the district. Not with respect to the claims against the court and the PUD? Only with respect to the claims against them? Not with respect to the claims against the court and the PUD? Only with respect to the claims against them? Did CBI advance any claims against the district in a cross-claim or a counter? Not that I'm aware of, Your Honor. Cross-claim. Cross-claim, no, Your Honor. I should also add, Your Honor, that the ‑‑ Judge Benitez was asking about parallel, potential parallel proceedings here. I mean, suppose, let's just take this hypothetically speaking. Suppose the court and I guess the district has a right to have arbitration, and the court, I guess, has a right to have arbitration against CBI. So you're asking me about the inconsistency. Well, we think it would be, first of all, very prejudicial to plaintiffs to extend this proceeding out another year and a half. These are folks who are sitting on their hands on their lifelong investments,  The district court can always hold. How now is the position of CBI different than the plaintiffs? CBI has direct contractual claims. We are third-party beneficiaries. CBI has claims that are similar to the plaintiffs, but not altogether similar, because the estoppel claims and the civil rights claims that brought us to federal court in the first place are distinctly those of the plaintiffs and the associations and not CBI. And so because their claims are not necessarily identical, it could be that CBI could be ordered to go to arbitration, but not the individual plaintiffs. Well, I think as Mr. Tierney indicated, a claim with respect to CBI under the lease would have potential impacts to the plaintiffs as well. Plaintiffs would be unable to avoid participating in that arbitration in order to defend their interests under the lease. But if there's a contractual agreement that CBI agrees to be bound by the arbitration clause, right, they would be required to arbitrate unless we found that there was a waiver, which the trial court apparently did. But they'd be required to go to arbitration. The plaintiffs might not necessarily be required to go to arbitration, right? If there had been no waiver, that may be very well true. So getting back to Judge Pius's question, what do you think about the effect of having those possibly parallel proceedings going on at the same time? I mean, you could wind up with inconsistency. With disparate rulings, correct, with respect to the lease, correct. That is correct. And that is our concern. The other issue that you raise is with respect to the third-party beneficiary rights. This provision in this lease at ERO 532, recall that this entire island development was intended to provide individual leasehold interests. The port and the PUD participated in that redevelopment. They knew from the get-go that these individual lots were going to be sold, and they wrote into this lease a much broader binding effect paragraph than you would ever see in a typical lease. The lease in its term shall extend and be binding upon any person claiming to hold or to exercise any interest by, under, or through any of the parties hereto. That's far broader than you would see in a typical lease of this kind. So then you would agree that if that language is so broad, then the individual plaintiffs would be bound by the arbitration clause? If it were not for waiver, there is no defense to their having waited this long to bring a motion to compel arbitration given the third-party claims that the plaintiffs had made in the contract, under the contract. But if there was no waiver, you would agree that the plaintiffs would then be bound by the arbitration clause? Undoubtedly. And, Your Honor, I mean, they cite the Fisher case, I think, something like 15 times for the proposition that their behavior was excused. The Fisher case involved intertwining under the Securities Act, and it wasn't until the Supreme Court said that didn't apply to arbitral claims and allowed segregation of those claims. There are no cases that they can cite that would suggest that third-party beneficiaries would not be bound by an arbitration clause. They only had to read the three cases that you yourself authored, Martinez, I think, Garcia, Yosemite, that say third-party beneficiaries can be bound by arbitration clauses. The Van Ness case. You say that they should have asked for the arbitration when the suit was filed. Correct. And let me just, I have a few more minutes here, I see. The port should be on our side of the table, and they are not for one reason. They are beholden to the PUD. The port relies on the PUD for its electricity. The port cannot do battle with the PUD. And over the years, they kept saying to the PUD, let's extend this lease. Ask first for the extension. Ask first for the extension. But the PUD never responded. The port signed a lease with the plaintiffs without the PUD a party that extended the lease explicitly. And if it wasn't for that big gorilla in Grant County that is the PUD, they would be on our side of the table, because they have a stake in this just as much as the plaintiffs do with the PUD's breach of the lease. As Judge Quackenbush said, it seems to me that the commissioners just changed their mind despite the written agreements. And Your Honor asked about whether there had been rulings in this case. Judge Quackenbush doesn't go to the forum shopping issue, but it is so pervasive here, it is beyond cavil. You all probably know Judge Quackenbush. He does not hide his view of the issues. From the outset, at the first opportunity, he made his claims known. He's almost telling the PUD, PUD, come to your senses, because if there is a policy favoring arbitration, there is an equally strong policy favoring settlement. And if you were to order arbitration of CBI, for CBI, you are saying don't try to settle these cases, because you can be put in the position of having to arbitrate a case that you've been litigating for a year. In June of 2011, CBI notified the part, I'm sorry, the court held an oral argument on the PUD's motion to dismiss our claims. They raised enforceability. They raised standing. They raised a host of their defenses in that motion. The judge at the argument, he says to counsel, in writing, the court and PUD entered into written leases with plaintiffs, including a commitment to 2023 term. It appears to the court that the commissioners simply changed their mind. He denies the motion. He asks the court, he asks the parties to submit a, and by the way, that motion that was filed by the PUD, 400 plus pages. That's not trivial motion practice. Following the denial of the motion to dismiss, which in part was based on preemption, FERC's preemption, the PUD, he invited the parties to tell them whether he should stay proceedings, pending FERC's determination on the merits. They vigorously opposed it. They filed 100 pages. The -- Let me, we've looked at all of that. But let me ask, I think Judge Schroeder asked a question, I can't remember who, but why would there be any prejudice to you to go into arbitration? Prejudice is multiple on multiple points, Your Honor. There would be both substantive, both substantive prejudice as well as practical prejudice. We have spent a year preparing, pleading, discovery, thousands of pages of discovery, Federal Rules of Civil Procedure. Why wouldn't you be able to use all of that that you've mustered and use it to your good services in arbitration? Well, first of all, it's very likely that the PUD would simply want the arbitration panel to revisit the issues that they've already been denied by Judge Quackenbush. Only an Article III judge can order an injunction, which has occurred here. He has found on two separate occasions that we would be irreparably harmed by a failure to enjoin the PUD from evicting these folks from their houses. If it went to arbitration, would his injunction be vacated? I suspect that the PUD would have the opportunity to revisit that issue, wouldn't it? I don't know. And the -- I'm not an arbitrator. And the district court, would the district court still have jurisdiction if it were? I don't see how. And there would be an economic disparity. Wouldn't the district court just simply stay the action pending conclusion of the arbitration? Stay the action, stay the PUDs, that could very well be. The injunction would remain in effect. That could very well be. I don't know what the court would do. I guess if you ordered everybody to arbitration, there's no telling what he would do with the case. Right. And the other part of this, of course, is that both the court and the plaintiffs have invested hundreds of hours. Arbitration is intended to provide a streamlined process.  And they've spent hundreds of hours absorbing 50 years of history here. And they're asking now for three arbitrators at $1,200 to $1,500 an hour to revisit 50 years of history. That is a waste of judicial resources. It would absolutely put the plaintiffs at the mercy of the PUD. It has been their strategy from day one to win this case on anything but the merits. Thank you. All right. Let's see. We're down to 50. How much time do they have left? 54 seconds. That's what you got. That's what you got. I'll make it an even one. Thank you, Your Honor. We're not asking for a favor here. We're asking for a lease that was an arbitration provision and the lease that was agreed upon by the three signatories to be enforced. And that's what we're here asking for. The judge suggested that it was waived. There was no dispute, so there's no waiver. There's no prejudice. He didn't just suggest that it was waived. He found that it was waived. That's true. He did find that it was waived. And also, contrary to what counsel has indicated, we didn't evict these people. The lease expired in 2012, and we gave them notice that we weren't going to renew it. But as far as the other plaintiffs. If you're right, they're out. Pardon me? If you're right, they're out. Right. Right. And as far as the other plaintiffs, CBI brought claims not only on behalf of CBI, but also on behalf of the other plaintiffs because the plaintiffs own CBI. And so it's only appropriate that CBI and other plaintiffs also be here. And I think it's also the backdrop here for this whole type of situation is that the arbitration agreements are favored by the courts. And if there's questions about it, they're interpreted in favor of arbitration. All right. Thank you, gentlemen and ladies. Thank you. Thank you, counsel, for your interesting arguments. Matter is submitted.
judges: Benitez, Schroeder, Paez